IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 22-cr-109-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.      JOSEPH MICHAEL SULLIVAN, III,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S AMENDED MOTION FOR DISCLOSRE [*SIC*] OF CONFIDENTIAL
SOURCES AND DISCOVERY OF GIGLIO AND JENCKS MATERIALS**

---

On September 16, 2022, the Court conducted a hearing on Defendant Joseph Michael Sullivan, III's initial motion to disclose information related to the confidential informant in this case. (ECF No. 32.) The Court struck all briefing related to that motion and directed the parties to rebrief the matter. (*Id.*)

Now before the Court is Defendant's Amended Motion for Disclosre [*sic*] of Confidential Sources and Discovery of Giglio and Jencks Materials ("Motion"). (ECF No. 33.) The Government filed a response (ECF No. 34), and Defendant filed a reply (ECF No. 35). For the following reasons, the Motion is granted in part and denied in part.

## I. BACKGROUND

**A.**    **Indictment**

On March 23, 2022, a federal grand jury returned an Indictment that charged

Sullivan in two counts: (1) possession or transfer of a machinegun, in violation of Title 18 U.S.C. § 922(o), alleged on or about January 20, 2022; and (2) possession of a firearm or ammunition by a prohibited person, in violation of Title 18 U.S.C.§ 922(g)(1), alleged on or about February 17, 2022.  (ECF No. 1.)

**B.    Factual Background**

On or about December 15, 2021, Colorado Springs Police Department ("CSPD") Detective Andrews spoke with a Confidential Informant ("CI#1") who identified Defendant as an individual in possession of several firearms despite such possession being prohibited due to Defendant's status as a convicted felon.[1]  (ECF No. 33 at 2.) CI#1 provided Defendant's address and cell phone number.  (*Id.*)  CI#1 further stated that he had known Defendant for approximately two years and said they socialized often but "not in a criminal aspect."  (*Id.*)  CI#1 also told Detective Rodger that Defendant routinely possessed weapons and bought, sold, and bartered personal property, including firearms.  (*Id.*)  CI#1 stated his belief that most of the items Defendant sold were obtained from thefts and burglaries.  (*Id.*)  CI#1 also stated that Defendant used a 3D printer to manufacture parts for AR rifles, which converted them from semi-automatic to fully automatic.  (*Id.*)  CI#1 also reported that Defendant was a methamphetamine user and sold methamphetamine and fentanyl pills.  (*Id.*)  Finally, CI#1 agreed to introduce an undercover law enforcement officer to Defendant.  (*Id.*)

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATFE") Special Agent

---

[1] In the Motion, Defendant states that he has learned that CI#1 has a 2005 federal felony drug distribution conviction and multiple state felony drug distribution convictions barring him from legally possessing firearms.  (ECF No. 33 at 3.)

("SA") Jason Jewkes[2] conducted surveillance of Defendant's residence/place of business, observed activity consistent with the sale of narcotics, and directed CI#1 to set up a meeting with Defendant to purchase weapons on January 13, 2022.  (*Id.*; ECF No. 34 at 2.)

According to Defendant, the Government's reports are silent as to the interaction between SA Jewkes and CI#1 prior to SA Jewkes being introduced to Defendant by CI#1.  (ECF No. 33 at 3.)  However, based on information and belief and comments gleaned from an undercover audio recording, Defendant states that CI#1 told him that undercover SA Jewkes was a high-ranking member of a Mexican drug cartel, that he was a very dangerous person, and Defendant was to agree to any requests made by this person or else there would be dire consequences for Defendant.  (*Id.*)  Defendant states that he "took this threat seriously and felt he had no choice but to meet with this person and to comply with any requests the man made of him."  (*Id.*)

SA Jewkes and CI#1 met with Defendant, though no weapons were sold.  On January 18, 2022, SA Jewkes and CI#1 again met with Defendant, and SA Jewkes purchased three conversion devices from Defendant for $1,050.  CI#1 was paid $50 per device for his cut of the transaction.  (*Id.* at 4; ECF No. 34 at 3.)

On January 20, 2022, Defendant states that SA Jewkes and CI#1 again met with Defendant, and SA Jewkes obtained a replacement for the conversion devices, which he said did not work.  (ECF No. 33 at 5; ECF No. 34 at 3.)  The Government disputes that CI#1 was at this meeting.  (ECF No. 34 at 3.)  Later that day, SA Jewkes tested the

---

[2] Defendant refers to SA Jewkes as the undercover officer who met multiple times with Defendant.  (ECF No. 33.)  However, the Government merely refers to the undercover officer as the UC, not confirming it was SA Jewkes.  (*See, e.g.*, ECF No. 34 at 2.)

3

conversion device provided earlier that day using a standard-issued ATF semi-automatic rifle, which was video recorded. (ECF No. 34 at 3.) The Government states that the device proved to be functional, allowing the semi-automatic rifle to be fired at a fully automatic rate of fire.[3] (*Id.*)

On February 1, 2022, SA Jewkes bought six more conversion devices from Defendant for $300 per device. (ECF No. 33 at 5; ECF No. 34 at 4.) The Government states that CI#1 was not present for this meeting. (ECF No. 34 at 4.) Additionally, Defendant showed SA Jewkes a revolver and two rifles. (ECF No. 33 at 5.)

On February 15, 2022, Defendant states that CI#1, his girlfriend, and her friend[4] went to Defendant's business with drugs and several firearms, including a short barrel shotgun, purportedly for Defendant to fix. (*Id.* at 5–6.) Further, Defendant states that he asked CI#1 to take his firearms with him when he left, but CI#1 refused. (*Id.* at 6.) Later that day, CI#1 told CSPD Detective Andrews that he had been at Defendant's business and saw numerous weapons, including two shotguns. (*Id.*) CI#1 told "his handler" that all of the firearms belonged to Sullivan, though CI#1 had left his own short barrel shotgun there earlier that day. (*Id.*)

On February 16, 2022, investigators with the ATFE obtained a federal search warrant for Defendant's business. (*Id.* at 6; ECF No. 34 at 4.) The affidavit in support of the warrant application included information from CI#1. (ECF No. 33 at 6.) CSPD

---

[3] The Government states that this device is the basis for Count 1 of the Indictment. (ECF No. 34 at 3.)

[4] Defendant states that he interviewed CI#1's former girlfriend and her friend, who both corroborate these events. (ECF No. 33 at 6 n.3.) Additionally, Defendant states that CI#1 has since threatened both women in relation to his assisting law enforcement with their investigation of Defendant. (*Id.*)

4

detectives also obtained an arrest warrant for Defendant on unrelated state narcotics-related charges.  (ECF No. 34 at 4.)

On February 17, 2022, investigators instructed CI#1 to lure Defendant away from the residence to allow CSPD officers to arrest Defendant on the unrelated state arrest warrant, allowing ATFE investigators, assisted by other officers, to execute the search warrant at Defendant's residence.  (*Id*.)  CI#1 did so, and Defendant was arrested by CSPD officers.  (*Id.*)  During the arrest, Defendant was found in possession of a Springfield, Model XDm 40, .40 semi-automatic pistol.  (*Id.*)  The firearm was loaded, with one round of ammunition in the chamber and 15 rounds in the magazine.[5]  (*Id.*)  Law enforcement executed the warrant the following afternoon and seized various firearms; several rounds of ammunition and shotgun shells; various firearms magazines, equipment, and related items; and suspected controlled substances, including suspected fentanyl pills, methamphetamine, and cocaine.[6]  (*Id.* at 5.)

Following Defendant's arrest by CSPD, Detective Andrews conducted a recorded custodial interview with Defendant, who was advised of his *Miranda* rights prior to the interview and agreed to waive those rights to speak with Detective Andrews.  (*Id.* at 6.)  During the interview, Defendant admitted he was a convicted felon and stated that he was in possession of the firearm to protect himself because he was shot during an altercation in December 2019.  (*Id.*)  Defendant further stated that the weapons inside the residence belonged to him and that he was doing a service to the police department

---

[5] The Government states that this firearm is the basis for Count 2 of the Indictment.  (ECF No. 34 at 4.)

[6] However, Defendant is not currently charged with any offenses related to the items found at the residence during the execution of the search warrant.  (ECF No. 34 at 5–6.)

by taking firearms off the streets.  (*Id.*)

## II. LEGAL FRAMEWORK

**A.	The Government's General Duty of Disclosure in Criminal Cases**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the prosecution's suppression "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In *Giglio v. United States*, 405 U.S. 153 (1972), the Supreme Court extended the prosecution's disclosure obligations, explaining that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" violates *Brady*.  *Id.* at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *see also Douglas v. Workman*, 560 F.3d 1156, 1172–73 (10th Cir. 2009) ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [government's] witnesses by showing bias and interest.'").

Finally, in *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), the Supreme Court refined *Brady* and clarified that it is not necessary that a defendant affirmatively request favorable evidence; to the contrary, "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 433 (internal quotation marks and quotation omitted); *see also United States v. Summers*, 414 F.3d 1287, 1304 (10th Cir. 2005) ("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  Moreover, the

Government's duty to disclose "continues throughout the judicial process." *Workman*, 560 at 1173.

On the other hand, "[i]t is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" *United States v. Badonie*, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005). "A prosecutor does not have a duty . . . to obtain evidence from third parties." *Id.*

**B.    The Government's Duty to Disclose Confidential Informants' Identities and Other Information**

Because of the strong public interest in effective law enforcement, "the government enjoys a privilege to withhold from disclosure the identity of persons who furnish law enforcement officers with information on criminal acts," because anonymity encourages citizens to communicate unlawful activity to government officials. *United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992). Nevertheless, this privilege must give way to fairness when disclosure of an informant's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id*. (quoting *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957)); *see also United States v. Reardon*, 787 F.2d 512, 517 (10th Cir.1986) (noting that a court must order disclosure if the confidential informant's testimony "might be relevant to the defendant's case and justice would best be served by disclosure").

A defendant seeking disclosure has the burden of proof that such disclosure is warranted, and he must provide more than "mere speculation about the usefulness of an informant's testimony" to warrant disclosure. *United States v. Scafe*, 822 F.2d 928, 933 (10th Cir. 1987). "The defendant must explain to the court as precisely as possible what testimony he thinks the informer could give and how this testimony would be

7

relevant to a material issue of guilt or innocence." *United States v. Ridley*, 814 F. Supp. 992, 996 (D. Kan. 1993), *on reconsideration*, 831 F. Supp. 808 (quoting *United States v. Blevins*, 960 F.2d 1252, 1259 (4th Cir. 1992)).

The determination of whether a confidential informant's identity should be disclosed involves a balancing of the public interest in protecting the flow of information to the Government against an individual's right to prepare his defense. *Id*. (citing *Roviaro*, 353 U.S. at 62). Resolving these competing interests turns on the "particular circumstances of each case," taking into consideration "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro*, 353 U.S. at 62. The Supreme Court has explained that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. *United States v. Aguilar*, 2010 WL 2977708, at *4 (D.N.M. June 28, 2010) (citing *Roviaro*, 353 U.S. at 64).

The Tenth Circuit has explained that cases involving confidential informants often fall into several "broad categories" along a spectrum:

> At one extreme are the cases where the informant is a mere tipster, and disclosure is not required. At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial. In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

*United States v. Moralez*, 908 F.2d 565, 568 (10th Cir. 1990). Accordingly, "[w]here it is clear that the informant cannot aid the defense, the government's interest . . . must

prevail over the defendant's asserted right of disclosure." *United States v. Martinez*, 979 F.2d 1424, 1429 (10th Cir. 1992). Moreover, "if a confidential informant was only a 'tipster,' and not an active participant in the criminal activity charged, disclosure . . . is not required." *United States v. Zamora*, 784 F.2d 1025, 1030 (10th Cir. 1986). Nor is disclosure required where the information sought "would be merely cumulative." *Scafe*, 822 F.2d at 933. However, it is constitutional error to deny disclosure solely because of the potential danger to the informant. *Id.* at 934.

The district court's determination about the need for disclosure is reviewed for an abuse of discretion. *United States v. Sinclair*, 109 F.3d 1527, 1538 (10th Cir. 1997).

### III. ANALYSIS

Defendant conceded at the September 16, 2022 hearing that CI#1 is "very well known" to Defendant, as CI#1 was Defendant's drug dealer. (*See also* ECF No. 33 at 7 (noting that Defendant knows the identity of CI#1).) Additionally, Defendant stated at the hearing that he intends to call CI#1 in his case at trial to ask him questions related to CI#1 having told Defendant that undercover SA Jewkes was a cartel member and a very dangerous person and that Defendant was to comply with any requests that undercover SA Jewkes had.[7] Specifically, Defendant states that these issues pertain to a coercion defense and a motion to dismiss for outrageous governmental conduct.[8]

---

[7] Defendant reiterates his intention to call CI#1 as a witness at trial in the Motion when he states that unless Defendant "waives his constitutional right not to take the stand in his own defense, CI#1 is [Defendant's] one material witness." (ECF No. 33 at 17.)

[8] At the hearing, Defendant stated that these issues "go to an entrapment or coercion defense and . . . also goes to an outrageous governmental conduct pretrial motion." In his briefing on the Motion, however, Defendant disclaims that he will assert an entrapment defense, stating that "the government['s] response . . . conflates the affirmative defense of entrapment with the defense of coercion or duress." (ECF No. 35 at 2.) Rather, Defendant states that he seeks to present a "coercion or duress defense based upon the conduct of CI#1." (*Id.* at 1.) He explicitly states that he will "not rely on an entrapment defense at trial," though he equivocates

9

Defendant also states in the Motion that he intends to use such information for impeachment purposes, even if Defendant—not the Government—calls CI#1 to testify at trial.  For these purposes, Defendant requests the following information:[9]

- CI#1's last known address (ECF No. 33 at 13);
- Guilty verdicts or other bad acts (*Id.* at 13–14);
- Disclosure of the promises or other inducements which led CI#1 to cooperate with law enforcement in their investigation of him (*id.* at 14);
- Prior testimony related to a 2005 arrest of CI#1 in which he was arrested for possession with intent to distribute methamphetamine[10] (*id.* at 14–15);
- CI#1's confidential informant file (*id.* at 15–16); and
- Evidence of CI#1's prior informant activity (*id.* at 16).

As an initial matter, on this record, the Court cannot credibly conclude that CI#1

---

on whether his forthcoming motion to dismiss for outrageous governmental conduct may overlap with entrapment.  (*Id.* at 3.)

The Court does not prejudge motions, particularly ones that have yet to be filed.  However, based on Defendant's written statements, Defendant will be judicially estopped from asserting an entrapment defense at trial.

Regarding any forthcoming motion to dismiss based on outrageous governmental conduct, the Court reiterates that it will not prejudge any motions.  Nonetheless, the Court agrees with the Government that on the current record, there is no basis from which the Court could conclude that Defendant was not predisposed to commit the crimes charged; to the contrary, the evidence on the current record shows the opposite.  (ECF No. 34 at 12.)

[9] To the extent Defendant's Motion requests *Brady* and *Giglio* material related to witnesses other than CI#1 (ECF No. 33 at 13–14), the Court relies on the Government's representations that it continues to comply with its disclosure obligations under those Supreme Court cases.  The rulings in this Order relate specifically to the Government's obligations concerning CI#1.

[10] Defendant states that he asked the Government to investigate if any of the statements made by CI#1 related to a motion for a United States Sentencing Guidelines § 5K1 sentence reduction "turned out to be false or misleading and if he was ever called upon to testify as part of continuing cooperation."  (ECF No. 33 at 15.)

10

was simply a "mere tipster" in this case, such that disclosure is unwarranted under *Zamora*. Even the Government appears to have largely abandoned that characterization of CI#1. (*See generally* ECF No. 34.) Regardless, as explained in the Background section, not only did CI#1 introduce undercover SA Jewkes to Defendant, he also accompanied him to meetings with Defendant to procure firearms, took a financial "cut" when SA Jewkes purchased conversion devices, and assisted law enforcement in luring Defendant away from the residence/business so they could execute the search warrant. Therefore, the Court proceeds to engage in the *Roviaro* analysis.

Taking the *Roviaro* factors as well as general discovery obligations in criminal cases under Rule 16, *Brady*, and *Giglio* into consideration, the Court concludes that it should grant Defendant's request in large part. First, the crimes charged are illegal possession or transfer of machine gun parts and illegal possession of a weapon by a prohibited person, for which Defendant could receive up to 20 years imprisonment.

Second—and perhaps most important for the purposes of this Order—Defendant has stated that he will assert the affirmative defense of duress and file a motion to dismiss based on outrageous governmental conduct. (ECF No. 33 at 8.) He claims that both of these arguments hinge on obtaining the information requested concerning CI#1. (*Id.*)

Third, Defendant argues that his entire defense rests upon the conduct of CI#1, making his testimony "of paramount importance to his defense." (*Id.*)

Finally, concerning "other relevant factors," Defendant explains that CI#1 has been charged with two separate cases in state court for Class 1 drug felonies, one of

11

which CI#1 is alleged to have committed while acting as an informant, and the other of which he was presumably trying to "work off" by cooperating with law enforcement.  (*Id.*)  Additionally, Defendant states that two defense witnesses have been threatened by CI#1 because they were aiding his defense and knew CI#1 was working for law enforcement.  (*Id.*)

In short, CI#1's testimony could be highly relevant to Defendant's defense of duress, and his potential testimony appears to be unavailable from any other witness.  *Aguilar*, 2010 WL 2977708, at *6 (ordering disclosure of confidential informant's identity).  As such, it is not at all "clear that the informant cannot aid the defense." *Sinclair*, 109 F.3d at 1538.  Particularly persuasive is Defendant's clear intention to call CI#1 as a witness at trial.  This is in stark contrast to other cases in the Tenth Circuit, in which courts have denied defendants access to a variety of information concerning confidential informants, and where those courts have highlighted the fact that those defendants had *not* made clear their intentions to call the confidential informants to testify at trial.  *See United States v. Espinoza Romero*, 2016 WL 11642373, at *5 (D. Colo. Aug. 8, 2016) (noting that the defendant did not make a credible argument that he would call the confidential informant as a witness at trial, and the government did not intend to do so either);  *Aguilar*, 2010 WL 2977708, at *6.

The Court also observes that the Government has not offered a compelling reason not to disclose this information to Defendant.  (*See* ECF No. 34.)  Instead, the Government focuses its arguments on a potential entrapment defense—which Defendant has disclaimed—and a forthcoming motion to dismiss for outrageous governmental conduct.  (*See id.*)  The Government argues that Defendant does not

12

elucidate how CI#1's information or testimony would be helpful to his defense in any way.  (*Id.* at 16.)  Particularly, the Government complains that Defendant has "failed to show how the CI's testimony or limited involvement in this case would demonstrate that the Government's conduct created the crime with which the Defendant is charged."  (*Id.* at 16–17.)  According to the Government, "[t]here is no evidence, nor does the Defendant claim to have evidence, that SA Jewkes, officers with CSPD, or any other law enforcement officer, instructed the CI to make any claim of this nature [concerning undercover SA Jewkes being a dangerous Mexican cartel member] to the Defendant."  (*Id.* at 19.)

The Government very well may be right.  At this juncture of the case, the Court cannot judge the merits of arguments, motions, and defenses not yet before it.  The Court sees no possible way, however, for Defendant to credibly mount these defenses in the absence of the information about CI#1 which he seeks in the Motion.

Therefore, the Court orders the Government to disclose to Defendant the information he seeks solely with respect to CI#1, with the following exceptions.  The Government is not obligated to disclose CI#1's prior testimony (ECF No. 33 at 14) or his prior informant activity (*id.* at 16).  To the extent Defendant requests in the Motion information related to other persons, his request is denied; this Order solely obligates the Government to disclose information related to CI#1.

### IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1. Defendant Joseph Michael Sullivan, III's Amended Motion for Disclosre [*sic*] of Confidential Sources and Discovery of Giglio and Jencks Materials (ECF No. 33)

is GRANTED IN PART and DENIED IN PART as set forth herein;

2. The Government is DIRECTED to produce the discovery ordered herein by **November 30, 2022**;

3. To the extent the Government deems it necessary and appropriate, it is DIRECTED to submit a proposed protective order prior to disclosure of the discovery;

4. To the extent Defendant still intends to file a motion to dismiss based on the discovery he receives as a result of this Order, Defendant is DIRECTED to file any motion to dismiss by **December 14, 2022**;

5. The Government is DIRECTED to file a response to any motion to dismiss by **January 3, 2023**;

6. Defendant is to file a reply by **January 17, 2023**;

7. In the event the Defendant does not file a Motion to Dismiss by December 14, 2022, the Court will immediately set a jury trial to begin within the speedy trial deadline; and

8. Given that the Government's Motion to Exclude Thirty (30) Days From the Speedy Trial Calculation Pursuant to 18 U.S.C. § 3161(h)(7)(A) ("EOJ Motion") (ECF No. 20) was filed in connection with the Motion, in light of this Order, the EOJ Motion is DENIED AS MOOT.

Dated this 21st day of November, 2022.

BY THE COURT:

_____
William J. Martinez
United States District Judge